(C. D. 368)

AGFA ANSCO CORP. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 18, 1940)

*Eugene R. Pickrell* (*Eugene A. Chase* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: These are suits against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on particular importations of resistance measuring mechanisms invoiced as "Leitfahigkeits-Messaparat." Duty was levied thereon at the rate of $4.50 each plus 65 per centum ad valorem under paragraph 368 (a) (1) and (2) of the Tariff Act of 1930 as mechanisms, devices, or instruments and parts thereof for measuring the flowage of electricity. It is claimed that said articles are properly dutiable under said act at the rate of 27½ per centum ad valorem under paragraph 372 as machines or parts thereof not specially provided for; or alternatively, at the rate of 35 per centum ad valorem under paragraph 353 as articles having

as an essential feature an electrical element or device; or at 45 per centum ad valorem under paragraph 397 as articles composed in chief value of base metal not specially provided for. It appears, however, that the claim relied upon in the brief of counsel for the plaintiff is that alleged under said paragraph 372.

A photograph of the apparatus at bar, together with a stop watch and a sample strip of film (neither of which was included in the importation), was admitted as Illustrative Exhibit A, and a diagram showing the construction of the apparatus with an added 150-volt battery (which also was not included in the importation) was admitted in evidence as Illustrative Exhibit B.

In addition to the exhibits, the plaintiff offered in evidence the testimony of one Willy Schmidt, assistant plant manager of the plaintiff-corporation and a qualified chemist and physicist. He testified that the function of the device in question was to compare various materials in regard to their conductivity or their resistance to the flow of electrical current.

Asked by counsel to explain the operation of the apparatus represented by Illustrative Exhibit B, the witness testified in part as follows:

The battery is used to apply the potential to two electrodes. The potential is indicated by an electrostatic voltmeter. After the electrodes are placed in contact with the specimen the voltmeter will drop in voltage caused by the flow of current over the surface. It is observed what time is necessary to show the drop on the electrostatic voltmeter within preselected ranges. For instance, the time which it would take from the drop from 40 to 30 volts.

The witness then testified in part as follows:

Q. What are you interested in determining by this test?—A. We are interested in determining the rapidity of the time necessary for the voltmeter to show the preselected drop in voltage.

Q. What does the rapidity of that drop indicate to you?—A. It indicates the resistance to the flow of electricity of the specimen or the conductivity of the specimen.

Q. And that resistance indicates to you what the specimen will do for your purpose?—A. We use it in comparing it with other specimens, just to compare.

Q. You just use it to compare the resistance of one sample with the resistance of another sample?—A. Yes.

Q. You spoke of an electrostatic voltmeter in this apparatus. Is that electrostatic voltmeter the same as a voltmeter which would be used to measure the voltage in an electric light lamp?—A. No.

Q. How do they differ.?—A This voltmeter just shows the potential difference between two insulated blades, for instance a condenser.

Q. Does it show the static voltage?—A. Yes, you might say so, electrostatic voltage.

Q. There are two measuring blades, electrodes, I believe you called them, which connect the opposite sides with the condenser, is that correct?—A. That is correct.

Q. If there were nothing connecting the two measuring blades, or electrodes, and the condenser were charged, would the reading on the electrostatic volt-

meter remain constant?—A. It would remain constant for a reasonable time until the voltage leads away.

Q. Except for possible leakage, it would remain constant?—A. Yes.

Q. Under those conditions there is no flowage of electricity?—A. No.

Q. Is the resistance shown directly upon the instrument in any way?—A. No.

Q. You determine the comparable resistance by what, readings upon the instrument or elsewhere?—A. We read the voltage. There are two readings, a high and low one.

Q. A high and low reading on what?—A. On the electrostatic voltmeter. And by a stop watch we determine the time which the current takes to pass from the high mark to the low mark.

Q. Does either the high reading on the voltmeter or the initial voltmeter reading or the final voltmeter reading, do either of those measure the flow of electricity?—A. No.

Q. It is the measurement of the electrostatic potential existing at the time the reading is taken; is that correct?—A. Yes.

Q. Is that instrument used in pure science?—A. No.

Q. Where is it used?—A. It is used in manufacturing control by unskilled labor.

Q. It is used only in plants?—A. Yes.

## On cross-examination the witness testified in part as follows:

X Q. What do you use as your material that you put in between the two poles?—A. We use materials in which we are interested to determine the surface conductivity.

X Q. Such as what?—A. Photographic film, papers.

X Q. Now, your battery is connected with what, a condenser?—A. With the two poles of a condenser.

X Q. What is the voltage of the battery you use?—A. 150.

  *   *   *   *   *   *   *

X Q. There is electric current of 150 volts which will pass from one pole to the other, will it not, if you use it. Between the two poles of the condenser, the whole voltage would pass from one to the other, would it not?—A. Yes.

X Q. And when you use resistance, that is material, between the two poles, all the voltage does not flow, does it, from one pole to the other? That is, the material resists the flow of the electricity, does it not?—A. Yes, for a certain time.

X Q. That is what you measure, the resistance power of the material which you use between the poles?—A. No, we do not measure that.

X Q. What do you do?—A. We measure the time which is necessary for the condenser to become discharged.

  *   *   *   *   *   *   *

X Q. Do you have any ammeter connected with that imported thing?—A. No.

X Q. You don't measure the amperage?—A. We are interested in the condenser only.

X Q. The condenser is charged with 150 volts. What is the amperage?—A. The condensers are calibrated in farads. We have various ranges of the condensers which are included in that diagram.

## On redirect examination the witness testified as follows:

R. Q. Doctor Schmidt, when you charge the condenser, is there any flow of electric current in a complete circuit?—A. The flow is from the battery to the condenser.

R. Q. Is electricity flowing then in a complete circuit?— A. No. We just create a potential to both blades of the condenser.

On recross-examination he testified in part as follows:

R. X Q. You have to complete the circuit by connecting the negative poles, isn't that so, in order to charge your condenser?—A. No, it is no circuit.

\*    \*    \*    \*    \*    \*    \*

R. X Q. After you transmit your potential electricity from the battery to the condenser you have disconnected the battery, is that right?—A. Yes.

R. X Q. So then your condenser has simply stored electrical energy?—A. Yes.

R. X Q. Then you put your piece of merchandise, whatever it is, film, between the two poles of the condenser; is that right?—A. Yes.

R. X Q. That, also, makes a circuit; does it not?  A. Yes.

R. X Q. A complete electric circuit?—A. Yes.

R. X Q. And electricity flows through that circuit from one pole to another?—A. Yes.

R. X Q. Your voltmeter is connected in such a way that it measures the time it takes all the electricity to flow from one pole to the other?  In other words, it empties out the condenser; is that right?—A. Yes.

R. X Q. Your voltmeter is used with a stop watch to measure the time it takes to do that?—A. Yes.

Upon this record counsel for the Government in his brief filed herein insists that the apparatus at bar measures the flowage of electricity. With this contention we do not agree.

In a paper attached to the invoice and evidently submitted by the importer as part of the entry papers, which is quoted at length in the brief of counsel for the Government, occurs this significant statement: "Actually, the instrument will be used to measure, electrically, the resistance of dry emulsion for laboratory tests." This statement, taken in connection with the testimony of the plaintiff's expert witness, certainly contradicts the Government's contention.

Moreover, it is to be noted that the stop watch which is used in connection with the apparatus forms no part of the importation. The fact that there may be a complete electrical circuit is immaterial in view of the fact that the primary function of the device is merely to measure resistance and not to measure the flowage of electricity.

As pointed out in the exhaustive brief of counsel for the plaintiff, electrical current, or rate of flow, is measured in amperes, and in the apparatus at bar there is no such measure, because there is no flowage within the ordinary meaning of that word. The only electrical measurement which is shown or which the device is capable of indicating is a measurement of the static charge on the condenser, which is an electrostatic voltage or the potential difference between the two insulated blades attached to the condenser.

Moreover, the voltmeter which measures this potential differs from the ordinary type of voltmeter used to measure the flowage of electricity in an electric light circuit.

In the case of *T. D. Downing Co.* v. *United States*, T. D. 39963–G. A. 8726, 45 Treas. Dec. 35, this court had before it certain parts of a blood pressure testing mechanism which was assessed with duty as

parts of a device intended for measuring the flowage of water or similar uses under paragraph 368 of the Tariff Act of 1922. Although obviously that mechanism could not operate without the flowage of blood, it was held not to be classifiable under said paragraph 368 in that the imported articles were parts of a mechanism which merely recorded the pressure and not the flowage of blood.

Webster's New International Dictionary defines "pressure", as used in electricity, as "electromotive force," and defines the latter term as "difference of potential".

In the case of the apparatus at bar the readings taken are of differences of potential or of electrical pressure, and it is immaterial whether or not there was any flowage of electricity.

In *Adlanco Industrial Products Corporation* v. *United States*, T. D. 43159, 55 Treas. Dec. 126, this court had before it the question of the dutiable classification of certain testing machines known as ohmmeters and megohmmeters, which were used for testing, measuring, and determining the strength or resistance of insulation. Duty was levied thereon at the rate of 40 per centum ad valorem under paragraph 399 of the Tariff Act of 1922 as manufactures of metal not specially provided for. It was claimed that said articles were properly dutiable at the rate of 30 per centum ad valorem under paragraph 372 of said act as machines not specially provided for. This court sustained said claim citing the decisions in *United States* v. *Janson Co.*, 16 Ct. Cust. Appls. 315, T. D. 43075, and *United States* v. *Van Bourgondien Bros.*, 16 Ct. Cust. Appls. 420, T. D. 43135. Although paragraph 368 of said act was not invoked by the collector, nevertheless since it was in the Tariff Act the Second Division of this court would undoubtedly have held the merchandise to be within said paragraph if the evidence had warranted such a conclusion.

However, in the later case of *A. W. Fenton Co.* v. *United States*, Abstract 8596, 55 Treas. Dec. 1131, the issue was directly raised. Certain ohmmeters were classified for duty under the provision in paragraph 368 of the Tariff Act of 1922 for any device or mechanism having an essential operating feature intended for measuring time, distance, or fares, or the flowage of water, gas, or electricity. In spite of the fact that there was a flow of electrical energy through the insulation to be tested, nevertheless this court sustained the claim of the plaintiff and held that said paragraph 368 did not apply to the ohmmeters there in question.

In our opinion the case of *Ferranti, Ltd.* v. *United States*, T. D. 48242, 69 Treas. Dec. 609, wherein certain ammeters and voltmeters were held to be properly dutiable under paragraph 369 of the Tariff Act of 1930 is here easily distinguishable. There, the voltmeters were used to measure the voltage in the ordinary electric power circuit in which electricity is flowing, whereas the voltmeter contained in the

apparatus at bar is of an entirely different type in that it measures only the electrostatic potential and not the flowage of the electricity itself.

There is no question but what the apparatus at bar is a machine within the judicial definition thereof as contained in numerous decisions of this and of the appellate court. *Allen Forwarding Co. et al.* v. *United States*, T. D. 41506, G. A. 9123, 49 Treas. Dec. 706; *United States* v. *Janson Co.*, 16 Ct. Cust. Appls. 315, T. D. 43075; *United States* v. *Cambridge Instrument Co.*, 21 C. C. P. A. 508, T. D. 46970; *Selsi Co., Inc.* v. *United States*, T. D. 49235, and *Selsi Co., Inc.* v. *United States*, 1 Cust. Ct. 59, C. D. 16.

Upon the established facts and the law applicable thereto we hold said mechanisms invoiced as Leitfahigkeits-Messaparat to be properly dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of the Tariff Act of 1930 as machines not specially provided for or parts thereof, as alleged by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.