(C. D. 1979)

HERMAN H. STICHT CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 16, 1958)

*Strauss & Hedges* (*E. Thomas Honey* and *Eugene F. Blauvelt* of counsel) for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Henry J. O'Neill,* trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This cause of action brings before us for consideration the competition between provisions in paragraphs 368 and 353 of the Tariff Act of 1930, as modified.

The importation in controversy consists of a relatively new invention known as a Baldwin Dunlop statigun. It was classified by the collector of customs as an instrument or device intended or suitable for measuring the flowage of electricity, and duty was imposed thereon at the rate of $2.25 each and 32½ per centum ad valorem in paragraph 368 (19 U. S. C. § 1001, par. 368), as modified by the trade agreement with Switzerland, 69 Treas. Dec. 74, T. D. 48093.

Plaintiff's protest, as amended, embodies several alternative claims for lower rates of duty. However, plaintiff relies upon its primary claim, as stated in its brief, that the statigun is properly classifiable as "electrical instruments which are not laboratory instruments" and dutiable at 12½ per centum ad valorem in paragraph 353 of said act (19 U. S. C. § 1001, par. 353), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, supplemented by the Presidential proclamation No. 2929 of June 2, 1951, relating to the Torquay protocol to said general agreement, 86 Treas. Dec. 121, T. D. 52739.

### THE STATUTES

The pertinent text of the competing tariff provisions above referred to is here set forth, certain portions being stressed.

Paragraph 368 (a), as modified by the trade agreement with Switzerland, T. D. 48093:

| Tariff Act of 1930 paragraph | Description of articles | Rate of duty |
|---|---|---|
| 368 (a) | \* \* \* mechanisms, devices, or instruments intended or suitable for measuring the flowage of electricity; \* \* \*: <br> (1) \* \* \* <br> Valued at more than $10 each | $2.25 each |
| | (2) Any of the foregoing shall be subject to an additional duty of | 32½% ad val. |

Paragraph 353, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739:

| Tariff Act of of 1930, paragraph | Description of Product | Rate of Duty |
|---|---|---|
| 353 | *Electrical* signaling, radio, welding, and ignition apparatus, *instruments (other than laboratory)*, and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for (not including television apparatus, instruments, or devices)___ | 12½% ad val. |

## The Exhibits

Plaintiff introduced the following exhibits:

Exhibit 1, sample of the imported Baldwin Dunlop statigun.

Illustrative exhibit 2, a typical voltmeter.

Illustrative exhibit 3, an electrometer tube, which is a part of the interior mechanism of the statigun—exhibit 1.

Illustrative exhibit 4, diagram prepared by the witness, Beach, depicting the electrical circuit within the statigun—exhibit 1.

At the trial, it was stipulated and agreed that the merchandise in controversy is wholly or in chief value of metal, other than gold, lead, platinum, or tin, and that it is not plated and not colored with gold lacquer.

Two witnesses were called in this case on behalf of the plaintiff. None was called by the defendant.

Arthur H. Volker, the first witness, testified that he was vice president in charge of sales and treasurer of the importing firm, with which he had been identified for 19 years; that the business of the firm was the importation and distribution of electrical and measuring instruments. He identified exhibit 1 as the statigun which his firm had been importing for approximately 3 years. Its sales of statiguns are to industrial manufacturing firms, such as the DuPont Co., Hercules Powder Co., Merck & Co., "and many other chemical and industrial firms"; that the statigun is primarily a device for detecting electrostatic charges and that it is not a laboratory instrument.

Volker further testified that "The typical purchaser would use the statigun to detect where and when static electricity is generated and measured, such as in paper mills, rubber coating operations, plastic sheathing, printing operations, where materials come over a system of rollers and generate terrific static charges." He pointed out that static electricity in industry may cause serious trouble for two reasons:

It may cause terrific shocks or even death to the personnel, or it

may cause fires and explosions where flammable liquids or mixtures are present. By pointing a statigun toward a given operation, it will show exactly where static electricity is, and how much, by watching the pointer on the gun. Where static electricity is ascertained, a static neutralizer is installed. Volker further explained that the principal component part of the statigun is the electrometer tube which is stationed in the barrel. Other principal parts are an indicating meter and the stock of the statigun, which contains six batteries that are used to energize the circuits. Another battery is located in the handle of the gun.

It is here pointed out that the word "statigun" is a British trade name for the article which is patented in England, bearing the number 588420, having been invented and developed by the Dunlop Rubber Co. in England. Volker testified that the pointer on the dial of the meter attached to the gun indicates an electrical field strength or potential gradient in volts per foot; that the initial K means kilo, or one thousand, and KV means one thousand kilovolts per foot.

In physical appearance, the statigun bears a resemblance to the ordinary pistol or revolver, except that it is much larger. It has a stock, a chamber in which batteries are contained, and a barrel where the electrometer tube is located.

Plaintiff's second witness, Dr. Robin Beach, testified that he was an electrical engineer and was head of the electrical engineering department at Brooklyn Polytechnic Institute for 25 years. Since 1944, he had been a consulting engineer in the field of electrostatic engineering. He has 4 patents on electrostatic devices, and has written 2 books and about 45 papers on the subject. In brief, his qualifications to testify on this controversial subject were outstanding. His testimony corroborated that of the witness Volker, who likewise displayed an intimate and intelligent knowledge of the subject. Salient features of Dr. Beach's testimony follow.

He testified in great detail regarding the nature, character, and uses of the statigun, as well as to the essential differences in and qualities of static electricity, as opposed to dynamic electricity. Static electricity is usually negatively charged and is somewhat like a magnetic field that comes from a magnet. It permeates the space out and around the charged surface. By pointing the barrel of the statigun at an electrified surface, it measures the potential gradient of the static electricity. The front end of the barrel which receives the electrical field is connected by wire to the electrometer tube in the statigun. This causes the meter needle to move up the scale which shows the value of the electrical field which is multiplied by the scale reading. The instrument indicates the potential gradient in the field which is

the voltage across a 1-foot distance. The gun not only identifies the presence of static electricity, but indicates its intensity.

On the other hand, dynamic electricity is generally measured on a normal voltmeter, ammeter, or wattmeter. These meters must be connected to the line that is supplying the load in order that the current flowing through the line must pass through the meter and return to the other side of the circuit. An ammeter measures the flowage of electricity as does also a voltmeter in the sense that the current goes off one wire through the meter and to the other wire in the same circuit. As stated by the witness, dynamic electricity is electricity that moves, but static electricity is stationary electricity that resides on an object. Static electricity cannot normally get away except by sparking to something that comes close to it. On the other hand, dynamic electricity is electricity in motion that travels in wires or other media. The measurement of static electricity by the statigun is in terms of potential current, known as volts per centimeter, volts per inch, or per foot. In the event of a surface charged with static electricity, the electrical field seeks the ground, and there is no unit that exists to identify the strength of the field at a particular point other than the terminology of volts per foot, the same difficulty existing in the measurement of a magnetic field.

The testimony of the witnesses, above referred to, which is not rebutted in any way, demonstrates that science and inventive genius have combined to produce a device of great value and importance to our economy and industry in many fields. By means of the statigun, the possibility of injurious effects to mankind and the destruction of machinery and materials by static electricity is now readily detected, arrested, neutralized, and dissipated. As disclosed by the record, the statigun has demonstrated its importance to manufacturers of plastic materials, printing materials, and other industries, and the gun has found its place with such well-known firms as DuPont, Hercules Powder, and Merck & Co.

It is that article which the Government claims is used to measure the flowage of electricity. However, the testimony of the witnesses detailed above points up the marked difference between static and dynamic electricity. The former, as the name implies, remains stationary, while the latter moves or flows through the wires or other carriers provided for it.

By reason of its special equipment, the statigun detects the presence of static electricity and indicates in kilovolts its gradient. However, in no true sense, does it measure the flow of electricity.

An earlier case before this court tends to support the conclusion we have reached. In *Agfa Ansco Corp.* v. *United States*, 5 Cust. Ct. 50, C. D. 368, the court considered the proper classification of certain

resistance-measuring mechanisms which had been classified, as in the present case, as devices for measuring the flowage of electricity in paragraph 368. In overruling the classification, we said in part—

* * * in the apparatus at bar * * * there is no flowage within the ordinary meaning of that word. The only electrical measurement which is shown or which the device is capable of indicating is a measurement of the static charge on the condenser, which is an electrostatic voltage or the potential difference between the two insulated blades attached to the condenser.

In that case, we took occasion to distinguish *Ferranti, Ltd.* v. *United States,* 69 Treas. Dec. 609, T. D. 48242, pointing out that— "There, the voltmeters were used to measure the voltage in the ordinary electric power circuit in which electricity is flowing, whereas the voltmeter contained in the apparatus at bar is of an entirely different type in that it measures only the electrostatic potential and not the flowage of the electricity itself."

Alternative claims, which were not pressed although not abandoned, are that the merchandise is dutiable at 13¾ per centum ad valorem as articles having as an essential feature an electrical element or device in paragraph 353 of the Tariff Act of 1930, as modified by the Torquay protocol, *supra,* or at 15 per centum ad valorem as articles suitable for modifying electricity in said paragraph 353, as modified by the General Agreement on Tariffs and Trade, *supra.*

In its reply brief, plaintiff states—"While it is believed that the two latter claims are applicable to the imported merchandise, plaintiff contends that the statiguns are more specifically provided for as electrical instruments, other than laboratory instruments, and plaintiff's argument has been accordingly confined to this claim."

In view of the evidence herein, we are satisfied that the statigun is not a device to measure the flowage of electricity and that its classification as such in paragraph 368, *supra,* can not be sustained. We are also of the opinion that the "primary claim" of plaintiff for classification in paragraph 353, as modified, *supra,* as an "electrical instrument" can not be sustained. The provision to which plaintiff refers is not, as we understand it, for electrical instruments, but for electrical signaling instruments, electrical radio instruments, electrical welding instruments, and electrical ignition instruments. The statigun does not respond to any of those descriptions, and we find nothing in plaintiff's arguments to sustain its primary claim.

This leads us to consider whether the imported article is embraced within the provisions in paragraph 353, as modified, *supra,* as stated in the reply brief of plaintiff, for "articles suitable for modifying electrical energy," dutiable at 15 per centum ad valorem, or as "articles having as an essential feature an electrical element or device," dutiable at 13¾ per centum ad valorem.

By reference to paragraph 353, it will be noted that the word "modifying" appears in a clause reading: "Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy." These words, we believe, have particular reference to dynamic electricity which may be subject to those qualifying words. The word "producing," for instance, is doubtless used in a transitive sense which would not, of course, apply to static electricity which is intransitive.

We are of the opinion that the statigun is not an article suitable for modifying electrical energy as the evidence clearly points out the design and purpose of the gun is to detect the presence of static electricity and to indicate its intensity. By subsequent proceedings, the static electricity may be neutralized and dispersed.

We now come to a consideration of whether the statigun may properly be classified as an article "having as an essential feature an electrical element or device" within the provisions of paragraph 353, as modified, *supra*, and dutiable at 13¾ per centum ad valorem.

Inasmuch as the record discloses that the imported device contains batteries and an electrometer tube as integral parts thereof, we are of the opinion that it is an article having as an essential feature an electrical element within said provision of paragraph 353, and we so hold.

The protest is, therefore, sustained to that extent. All other claims are overruled.

Judgment will issue accordingly.